United States District Court
Southern District of Texas
**ENTERED**
March 28, 2016
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| DERWIN PATRICK WILLIAMS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-15-82 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| *Acting Commissioner of the* | § | |
| *Social Security Administration*, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court is plaintiff Derwin Patrick Williams's ("Williams") motion for summary judgment. Dkt. 18. Also pending is a cross-motion for summary judgment filed by defendant Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration (the "Commissioner"). Dkt. 20. After considering the motions, responsive briefing, record evidence, and applicable law, the court finds that Williams's motion (Dkt. 18) should be **DENIED**, and the Commissioner's motion (Dkt. 20) should be **GRANTED**. The Commissioner's decision is **AFFIRMED**.

### I. BACKGROUND

Williams filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner regarding Williams's claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act ("the Act").

**A.     Medical History**

Williams was born on May 23, 1966, and was forty-one years old on the alleged disability onset date of March 1, 2008. Tr.[1] at 41, 152. Williams earned a general equivalency diploma (GED) in 1990 and worked as a carpenter/carpenter's helper from 1995 through 2005 and as an electrician's helper from 2005 through2008. *Id.* at 44–46, 157. After he was "laid off for a fire" from the position as an electrician's helper, Williams received unemployment beginning in 2008 through at least the second quarter of 2010 while searching for employment. *Id.* at 46–47. For a period thereafter, he performed "little odd jobs . . . . just trying to make ends meet." *Id.* at 44–45.

On January 26, 2010, Williams suffered a head injury in a motorcycle accident and was diagnosed with post-concussion syndrome and subsequently diagnosed with traumatic brain injury.[2] *Id.* at 38, 406. After the motorcycle accident, the only work Williams undertook was cleaning his church "every now and then" as a volunteer. *Id.* at 45.

On May 19, 2010, Dr. H.S. Chuang performed a consultative disability evaluation. *Id.* at 248. Williams complained of constant low back pain with intermittent shooting pain down one or both legs. *Id.* Williams told Chuang that the back pain was aggravated by standing or sitting for extended periods. *Id.* Williams reported feeling dizzy at times. *Id.* Chuang noted that, other than walking slowly, Williams's gait was normal and that he was "able to walk on his toes and heel bilaterally and perform tandem walking." *Id.* at 249. Low back pain prevented Williams from performing deep knee bends, and Chuang found Williams to have moderate limitation of the flexion

---

[1] "Tr." refers to the certified administrative transcript filed on April 14, 2015, as docket entry 9 and its attachments.

[2] The record contains no documentation of medical treatment prior to January 26, 2010.

and marked limitation of the extension and lateral bending of the back. *Id.* The x-rays taken on the day of the appointment revealed mild disc space narrowing at L5-S1 and no apparent compression fracture. *Id.* at 250.

On August 5, 2010, Dr. J.L. Paterson performed a consultative psychological evaluation, finding Williams to have normal thought content, intact recent and remote memory, judgment, and performance of simple calculations, and fairly intact abstract thinking and insight with below average general knowledge and borderline intellectual functioning. *Id.* at 255–56. Williams drove himself to the appointment and demonstrated fluid gross motor movements despite walking with a cane. *Id.* at 253. Williams explained that he lived with his seven-year-old son and reported that he was able to bathe and dress himself, to prepare food, to perform light housework, to drive when necessary, to socialize occasionally, to adapt to and cope with change, to shop occasionally, to read and write, to watch television, and to listen to the radio. *Id.* at 254–55. After performing a series of tests, Paterson diagnosed Williams with organic mental disorder NOS and borderline personality disorder. *Id.* at 257. The tests revealed evidence of underlying perceptual-motor dysfunction and short-term memory deficits. *Id.* at 258. However, the doctor noted no recent history of depression and no evidence of underlying psychosis and found Williams to be logical and coherent with social skills adequate for interaction in the workplace. *Id.* at 257.

On June 23, 2011, Dr. Ashok Vachhani of Tri-County MHMR Services performed a psychiatric evaluation and diagnosed Williams with bipolar disorder and depression with antisocial traits. *Id.* at 288–307. Williams returned to the Tri-County MHMR Services outpatient clinic five times for medication management between August 2011 and July 2012, at which point he was discharged for noncompliance. *Id.* at 308–25, 352–63, 473–80, 493–94.

On a monthly basis from July 2011 to March 2012, Williams saw Dr. Linda Hyde for diabetes and pain-medication management. *Id.* at 262–86, 327–350. On every visit from December 2011 to March 2012, Hyde noted that Williams had a normal gait and did not use an assistive device for walking but cautioned that he should not lift. *Id.* at 331, 334, 340, 346.

On April 21, 2012, Dr. Jerry Loving examined Williams on a consultative basis. *Id.* at 364–368. Williams reported back problems lasting for more than the past ten years and described his current symptoms as "chronic, shooting pain radiating to his legs, tingling, and numbness . . . exacerbated with prolonged sitting and standing and improv[ing] with heat application, medication, and rest." *Id.* at 364. Williams described his physical abilities to be sitting for thirty to forty minutes, standing for thirty to forty minutes, walking one-half of a block, and lifting and carrying five pounds repetitively and ten pounds occasionally. *Id.* at 365.

During the physical examination, Loving found Williams to have full muscle strength, normal sensory input, negative straight-leg test bilaterally, and symmetric 2+ reflexes. *Id.* at 366–67. The doctor noted tenderness in the lumbar muscles, a limited range of motion in the thoracolumbar, an inability to squat and rise from a squatting position, and an inability to hop on one foot. *Id.* at 367. However, Williams was able to lift, carry, and handle light objects, to rise from a sitting position, to walk on heels and toes with ease, to tandem walk normally, and to stand on either foot individually. *Id.* Loving observed that Williams carried a cane but was able to maneuver about the examination room without its assistance. *Id.* at 368. According to Loving, Williams explained that he primarily used the cane for longer distances and uneven terrain. *Id.* Loving found that Williams had a history of chronic low back pain, degenerative disc disease, and medically controlled diabetes. *Id.* He opined:

> The claimant can be expected to sit normally in an eight-hour workday with normal breaks. The claimant has mild limitations with standing and walking due to low back pain. The claimant needs an assistive device, such as a cane, with regards to long distances and uneven terrain. The claimant has mild limitations with lifting and carrying weight due to low back pain. There are limitations on bending, stooping, crouching, squatting and so on and the claimant will be able to perform these occasionally secondary to low back pain. There are no manipulative limitations on reaching, handling, feeling, grasping, fingering and the claimant will be able to perform these frequently. There are some relevant visual limitations relating to decreased visual acuity on the right without corrective lenses. There are no relevant communicative or work place environmental limitations.

*Id.*

On June 21, 2012, Williams presented to the emergency room at St. Luke's The Woodlands Hospital complaining of upper back pain caused by lifting. *Id.* at 484–91. The treating physician found Williams to have normal ranges of motion in upper and lower extremities and a normal gait. *Id.* at 489. The doctor diagnosed Williams with a lumbrosacral strain and ordered the administration of Ativan and Dilaudid injections, which immediately reduced Williams's pain, and prescribed Flexiril, a muscle relaxant. *Id.* at 487–88, 490.

**B.      Application to Social Security Administration**

Williams previously applied for disability insurance benefits alleging an onset date in January 2010. *See id.* at 42. According to the Commissioner, the application was denied on December 3, 2010, and was not appealed. Dkt. 20-1 at 2. Williams submitted a second application for disability insurance benefits with a protective filing date of September 20, 2011, this time with the earlier alleged onset date of March 1, 2008, and submitted an application for supplemental security income benefits based on the same alleged onset date. Tr. at 17, 152. Williams claimed the following conditions prevented him from working: degenerative back disorder, bipolar disorder, depression, and diabetes. *Id.* at 156. Williams reported that he stopped working on February 1, 2008, because

of his health conditions. *Id.* at 156. Williams's date last insured for disability insurance benefits was December 31, 2010. *Id.* at 17, 42.

Williams's reports to the Commissioner regarding functional limitations stated that he found it hard to stand or sit for any length of time, that his medications caused him to be sleepy, that he could no longer run, ride bikes, ride horses, hike, play basketball and football, or tie his own shoes, that he slept only three to four hours a night, that he needed reminders to take his medications and to take care of his personal hygiene, that he used a cane to ambulate, and that he could not prepare full meals or perform household chores other than occasionally folding clothes. *Id.* at 166–68, 170. He also reported that he was unable to go out alone or drive a car, that he would forget to pay bills or would write out checks incorrectly, that he could not lift more than ten pounds, that he had difficulty focusing and completing tasks, and that he did not handle stress very well. *Id.* at 169, 171–72. On the other hand, Williams reported that he engaged in the following activities: watching television, reading, and walking up to one-half of a block before needing rest. *Id.* at 170.

On May 3, 2012, Dr. Matthew Turner completed a Psychiatric Review Technique, finding organic mental disorder, depression, and antisocial traits as medically determinable impairments. *Id.* at 370–79. Turner found the following functional limitations: mild restriction of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and no episodes of decompensation. *Id.* at 380. Although Turner found evidence of psychiatric limitations, he found that the impact of Williams's symptoms did not fully compromise his ability "to function independently, appropriately, and effectively on a sustained basis." *Id.* at 382.

In a Mental RFC Assessment completed on the same day, Turner assessed Williams to have marked limitations in the ability to understand and remember detailed instructions and in the ability

to carry out detailed instructions. *Id.* at 392. In all other areas, Turner found Williams's limitations to be no more than moderate. *Id.* at 392-93. Turner opined that Williams could "maximally understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate[] for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work setting." *Id.* at 394.

On May 3, 2012, Dr. Robin Rosenstock completed a Physical RFC Assessment and found Williams capable of occasionally lifting and/or carrying fifty pounds and frequently lifting and/or carrying twenty-five pounds. *Id.* at 385. Rosenstock also found Williams capable of standing and/or walking about six hours in an eight-hour workday, sitting about six hours in an eight-hour workday, and pushing or/pulling without limitation. *Id.* No postural, manipulative, visual, communicative, or environmental limitations were noted on the assessment. *Id.* at 386–88.

The Commissioner denied Williams's application at the initial level in May 2012 and at the reconsideration level in July 2012. *Id.* at 63–66, 73–82, 86–89, 93–100. Williams requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration. *Id.* at 102–03. The ALJ granted Williams's request and conducted a hearing on June 26, 2013, in Houston. *Id.* at 34–62, 104–05, 111–16.

## C. Hearing

At the hearing, Williams and a vocational expert ("VE") testified.[3] *Id.* at 34–62. Williams was represented by an attorney. *Id.* at 34. The ALJ began the questioning of Williams. *Id.* at 39. Williams stated that he weighed about thirty pounds less than he had prior to the motorcycle accident

---

[3] Williams's attorney announced the presence of another witness, one of Williams's friends, but the transcript does not reflect that the friend provided testimony. *See* Tr. at 39.

and explained the weight difference as a result of becoming insulin dependent since the accident. *Id.* at 42, 43. When asked whether he used an assistive device for walking, Williams answered affirmatively, indicating that it had been prescribed by a doctor. *Id.* at 44. The ALJ asked a few more background questions and turned the questioning over to Williams's attorney, who focused on the period after the 2010 motorcycle accident. *Id.* at 45–47.

The attorney asked Williams about his psychiatric care after the accident. *Id.* at 47. Williams reported that he had been treated by a psychiatrist for bipolar disorder until sometime in 2012. *Id.* at 47–48. At the time of the hearing, Williams said, he experienced "good days and bad days" and "ups and downs." *Id.* at 48. He said a "good" or "up" day would be "not crying." *Id.* at 48. Williams also reported having trouble getting along with people and having problems with his memory. *Id.* at 48, 49. "I like to be around people. . . . I just can't get along," Williams explained. *Id.* at 48. Regarding his memory after the accident, Williams provided the example of walking into the kitchen and not remembering why he was there. *Id.* at 49.

Williams then discussed his back problem, which he said was more pronounced after the accident, describing daily pain primarily in his lower back but, more recently, also in his upper back. *Id.* at 50. He described the pain: "[I]t's just sore. I get shooting pains down my legs throbbing." *Id.* at 50–51. He also said that the back pain, in combination with diabetes, caused his legs to "start giving out on" him and caused his right leg to be a lot weaker than his left. *Id.* at 52. Williams stated that he could sit in one spot for "[m]aybe an hour" before having to stand and move. *Id.* at 51. The pain made it difficult, Williams said, to bend over to put on, tie, and remove shoes. *Id.* Williams said that Hyde and one of his other doctors were "pushing" him to have an operation on

his back. *Id.* at 55. Williams reported that he took medication "[s]paringly" for the back pain. *Id.* at 51.

In addition to taking hydrocodone and oxycodone for back pain, Williams testified that he was taking a muscle relaxer and medications for diabetes, nerve damage, bipolar disorder, depression, and schizophrenia. *Id.* at 51-53. As side effects, he reported that the schrizphrenia medication caused his face to go numb for about an hour and caused him to become dizzy. *Id.* at 54. When taken as prescribed, Williams said, the combined effect of the medications prompted him to lie down daily for about an hour. *Id.* Williams reported that he tested his blood sugar level at least three or four times per day and injected insulin four or fives times a day. *Id.* at 54–55.

Having reviewed the record and heard Williams's testimony, the VE classified Williams's past relevant work as a carpenter as medium and skilled, as a carpenter helper as "heavy, light, semi-skilled;" and as an electrician helper as medium and semi-skilled. *Id.* at 57–58. The ALJ presented the following hypothetical individual for the VE's consideration:

> I want you to assume an individual who is the same age as the claimant with the same education and work experience. He has the ability to perform light exertion as defined by Social Security Administration Regulations except he cannot work around vibrations. He cannot climb ropes, ladders or scaffolds. He cannot work in environments with air pollutants [or] irritants. He is limited to simple routine work that does not require more than occasional contact with the public.

*Id.* at 58. The VE opined that the hypothetical individual could not perform Williams's past occupations but could work as a mail room clerk, a small products assembler, or a shipping-and-receiving weigher, all positions represented in significant numbers in the state and national markets. *Id.*

The ALJ asked if jobs would be available to the same person if limited to sedentary exertion. *Id.* The VE listed three additional jobs that were found in significant numbers in the state and

9

national markets: file assembler, optical goods worker, and surveillance system monitor. *Id.* The VE said that no jobs would be available if that same individual was "limited by severe pain and psychologically based symptoms which cause periodic loss of concentration and attention to tasks [and] difficulties meeting attendance standards and would compromise his ability to perform work on a regular and continuing basis." *Id.* at 59.

The VE answered in the negative the attorney's query whether the same hypothetical individual with an inability to recall one, two, or three-step job instructions after a twenty-minute interval who needed prompting every twenty to thirty minutes would be employable. *Id.* Other limitations that individually would exclude the hypothetical individual from employability were: the inability to remember instructions for five minutes; the need to lie down or not be on task for one hour per eight-hour workday not including breaks; or mood swings between happiness, sadness, crying spells, and isolated behavior that would distract other individuals. *Id.* at 60. However, if the original hypothetical individual could only bend occasionally, rotate in the back or hips occasionally, and bend from side to side occasionally, he could still perform the light-exertion jobs of small products assembler and mail room clerk and all of the sedentary-exertion jobs. *Id.* at 61.

### D. Administrative Law Judge's Decision

On August 29, 2013, the ALJ determined that Williams was not under a disability from March 1, 2008, through the date of the ALJ's decision and denied Williams's application for disability insurance benefits and supplemental security income. *Id.* at 14-28. Initially, the ALJ found that, although Williams continued to work part time performing odd jobs through at least January 2010, he did not engage in substantial gainful activity after March 1, 2008. *Id.* at 19. The ALJ found that Williams had the following severe impairments since January 26, 2010: degenerative

disc disease of the lumbar spine, affective disorder, organic brain syndrome, and personality disorder. *Id.* The ALJ also determined that Williams "had no medically determinable impairment" from March 1, 2008, to January 26, 2010, and that diabetes was controlled by medication and did not cause functional limitations. *Id.* at 20.

At step three of the disability analysis, the ALJ determined that Williams did not have "an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments" in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *Id.* at 20. In making that determination, the ALJ considered Listings 1.04 (disorders of the spine), 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.08 (personality disorders). *Id.*

The ALJ concluded that Williams had the residual functional capacity to perform light work with the following limitations: inability to work around vibrations; inability to climb ropes, ladders, or scaffolds; inability to work in environments with air pollutants or irritants; inability to perform more than simple, routine work; and inability to be in contact with the public more than occasionally. *Id.* at 22. In reaching this conclusion, the ALJ cited Williams's written and hearing testimony, as well as the self-reports provided to treatment providers. *Id.* at 22-23. The ALJ determined that written documentation reflected a greater level of activity than Williams's testimony and found Williams's testimony to "not be entirely credible" as to the severity of his symptoms and his work abilities. *Id.* at 22-23. The ALJ also discussed Williams's medical treatment, including Chuang's, Paterson's, Tri-County MHMR Services', and Loving's examination/treatment notes, and Rosenstock's and Turner's RFC assessments. *Id.* at 23–25.

The ALJ found that Williams was unable to perform his past relevant work but had the residual functional capacity ("RFC") to perform the following representative occupations: mail room

clerk, small products assembler, and shipping-and-receiving weigher. *Id.* at 27. Thus, the ALJ found that Williams was not disabled from January 26, 2010, through August 29, 2013, the date of the ALJ's decision. *Id.* at 27.

Williams appealed the ALJ's decision, and, on October 1, 2014, the Appeals Council denied Williams's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner. *Id.* at 7-9, 12. After receiving the Appeals Council's denial, Williams sought judicial review of the decision by this court. *See* Dkt. 1.

## II. LEGAL STANDARD

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002).

In order to obtain disability benefits, a claimant bears the burden of proving that he is disabled within the meaning of the Act. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *see also Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); *see also Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

*Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); *see also* 20 C.F.R. §§ 404.1520, 416.920. The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. *Greenspan*, 38 F.3d at 236.

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." *Id.* The Commissioner has the responsibility of deciding any conflict in the evidence. *Id.* If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues *de novo*, or substitute the court's judgment for the Commissioner's judgment. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.

13

1999). In other words, the court should defer to the decision of the Commissioner as much as is possible without making its review meaningless. *Id.*

### III. ANALYSIS

In his motion for summary judgment, Williams argues that the Commissioner failed to give proper weight to the medical opinion of Loving, an examining medical source. Dkt. 18 at 6–10. Williams takes issue with the ALJ's finding that Loving's opinion is entitled only to "some weight" and with the ALJ's failure to include all functional limitations included in Loving's RFC determination. Dkt. 18 at 7–8. The Commissioner argues that the ALJ's decision, including the weight given medical-source opinions, followed correct legal standards and was supported by substantial evidence. Dkt. 20-1 at 13–22.

The ALJ must evaluate every medical opinion in the record and decide what weight to give each. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). In doing so, the ALJ considers the following nonexclusive factors: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; (5) the treating physician's area of specialization. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). Although the ALJ is required to consider these factors in deciding what weight to give an examining consultant, the ALJ is not required to record that process in writing. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (requiring that the factors be *considered*, not requiring that they be discussed in the determination notice); *Newton*, 209 F.3d at 256 (requiring that an ALJ set forth the analysis in writing only when the opinion of a treating physician is rejected based only on the testimony of a nonexamining,

nonspecialty medical expert). The ALJ also need not articulate reasons for the weight given a nontreating source's opinion. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (requiring that the ALJ give good reasons in the decision for the weight given a *treating source's opinion*); SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (emphasis added) (same).

Here, the opinion at issue was that of a consultative examiner, not a treating physician. The ALJ's only obligations were to evaluate the opinion and decide what weight to give it based on the factors listed in the regulations. The ALJ made no legal error by failing to articulate her findings on each factor or the reasons for the weight given Loving's opinion. In fact, the ALJ devoted a lengthy paragraph to Loving's three-page examination report. Tr. at 24. The paragraph addressed all of Loving's findings. *Id.* However, the ALJ did err in the summary of Loving's report on two significant points. The ALJ stated that "there was no tenderness to palpation in the lumbar muscles" and that Williams "was able to rise from a squatting position without assistance" when, in fact, Loving's report stated exactly the opposite. *Compare id.* at 24, *with id.* at 367. However, those errors, in and of themselves, are not enough to require reversal.

The Fifth Circuit has determined that district courts reviewing social security benefit denials must apply a harmless error analysis in evaluating the effects of an ALJ's purported failure to consider certain evidence. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) ("Having determined that the ALJ erred in failing to state any reason for her adverse determination at step 3, we must still determine whether this error was harmless."). The *Audler* court further explained that "[p]rocedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected." *Id.* (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)); *see also Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012). Harmless error exists when there is no

possibility that the ALJ would have reached a different conclusion absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Despite misstating Loving's medical findings, the ALJ correctly stated Loving's RFC determination, including his view that Williams could bend, stoop, crouch, and squat only occasionally due to lower back pain. *See* Tr. at 24, 25. The ALJ's errors arguably raise the question, then, whether the ALJ would have afforded Loving's opinion more than "some weight" had the ALJ correctly stated the medical findings on squatting and back tenderness and acknowledged that Loving's RFC determination was consistent therewith. Assuming that the ALJ would have given Loving's opinion more weight in that case, whether it was harmless error not to do so depends on whether the full incorporation of limitations recognized by Loving would not have changed the ALJ's conclusion.

Comparing Loving's RFC determination with the ALJ's, the court first notes that Loving's exertional limitations are consistent with light work, which comports with the ALJ's RFC determination. The light-work category limits lifting to no more than twenty pounds at a time and frequent lifting or carrying to no more than ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). Loving found that Williams had "mild limitations with lifting and carrying weight due to low back pain," which suggests a much greater ability to lift and carry than the upper limits of light work. Tr. at 368. Light work requires "a good deal of walking or standing," or, if involving mostly sitting, it requires "some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). Loving found that Williams had mild limitations with standing and walking, which is fully consistent with a "good deal" of walking or standing. Tr. at 368. The light-work limitations

on standing and walking do not preclude the use of an assistive device. Loving put no limitations on Williams' ability to sit or push and pull arm or leg controls. *See id.*

Regarding nonexertional limitations,[4] Loving imposed no environmental limitations whereas the ALJ limited work in environments with air pollutants or irritants. *Compare id.* at 22, *with id.* at 368. Neither Loving nor the ALJ imposed manipulative or communicative limitations. *Compare id.* at 22, *with id.* at 368. Loving stated in his RFC determination, that Williams had "decreased visual acuity on the right *without* corrective lenses." *Id.* at 368 (emphasis added). Correctable limitations do not factor into the RFC analysis. *Johnson*, 864 F.2d at 348 (citing 20 C.F.R. §§ 404.1530, 416.930; *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987)) (holding that an impairment which can be reasonably controlled or remedied with medication is not disabling under the Act).

That leaves the issue of postural limitations, which is where the two RFC determinations diverge. Loving limited bending, stooping, crouching, and squatting to occasional while the ALJ did not place any limitation on those activities but ruled out any climbing of ropes, ladders, or scaffolds, which is not mentioned in Loving's RFC. *Compare* Tr. at 22, *with id.* at 368. Ultimately, the ALJ's failure to include the additional postural limitations recognized by Loving was harmless error because none of the three representative occupations cited by the ALJ require postural activity. *See Dictionary of Occupational Titles* (4th ed. 1991), 209.687-026 (mail clerk), 1991 WL 671813; *id.* at 739.687-030 (small products assembler), 1991 WL 680180; *id.* at 222.387-074 (shipping-and-

---

[4] Nonexertional limitations include psychological, environmental, manipulative, communicative, visual, and postural limitations. *See* 20 C.F.R. §§ 404.1569a (c), 416.969a(c). The ALJ included the psychological limitation of only occasional contact with the public. Tr. at 22. Loving included no psychological limitation in his assessment as he evaluated Williams for solely for physical abilities.

receiving weigher), 1991 WL 672108. They each specifically rule out any requirement for stooping, kneeling, crouching, and crawling and implicitly rule out by omission any requirement for bending or squatting.[5] *See Dictionary of Occupational Titles* (4th ed. 1991), 209.687-026 (mail clerk), 1991 WL 671813; *id.* at 739.687-030 (small products assembler), 1991 WL 680180; *id.* at 222.387-074 (shipping-and-receiving weigher), 1991 WL 672108. Additionally, the VE testified that a hypothetical individual who could only occasionally bend, rotate in the back or hips, and bend from side to side could still perform work as a mail clerk and small products assembler. Tr. at 61.

Finding that the ALJ's decision is supported by substantial evidence and is sufficiently articulated, the court must affirm the Commissioner's denial of benefits in this case.

### IV. Conclusion

Williams' motion for summary judgment (Dkt. 18) is **DENIED**, and the Commissioner's cross-motion for summary judgment (Dkt. 20) is **GRANTED**. The Commissioner's decision is **AFFIRMED**. The court will enter a separate judgment consistent with this order.

Signed at Houston, Texas on March 28, 2016.

_____
Gray H. Miller
United States District Judge

---

[5] Loving referred to bending, stooping, crouching, and squatting, whereas the regulations refer to stooping, crouching, and crawling as the comparable postural limitations. *See* 20 C.F.R. §§ 404.1569a (c), 416.969a(c).